CIACCIO, J.*
| following remand, this matter returns to this court on appeal from the trial court’s determination that defendant, *456 James Dunn, is not mentally retarded and is therefore not exempt from capital punishment. For the reasons that follow, we affirm the trial court’s ruling in that respect. Furthermore, this court’s capital sentence review pursuant to La. Sup.Ct. Rule 28 dictates the death sentence imposed in this case is not disproportionate. The defendant’s sentence of death is therefore affirmed.
FACTS AND PROCEDURAL HISTORY
The facts of this crime were adequately set forth in this court’s previous decision, wherein defendant’s conviction was affirmed. State v. Dunn, 01-1635 (La.11/1/02), 831 So.2d 862. Insofar as they are pertinent to both the question of whether defendant is mentally retarded and to this court’s capital sentence review, the circumstances of the crime are as follows:
On June 4, 1998, the defendant borrowed a rental car from his girlfriend Leola Steward and picked up Kendall Breaux and Anthony Scott in Garyville, Louisiana. The three then |2went to Napoleonville. The defendant drove past the Iberville Bank to a convenience store where the trio purchased soft drinks. They then returned to the bank shortly before noon. Defendant parked the car in a handicapped parking space, and he and Scott entered the bank. There were two employees in the bank at the time. Lisa Dupuis, age 22, was behind the teller counter and 31-year-old Jacqueline Blanchard was seated at a desk near the front door. The bank surveillance camera documented the defendant and Scott entering the bank at approximately 11:40 a.m. The tape shows Ms. Dupuis conducting a written transaction for the defendant. While she filled out the document, defendant left the bank and walked back to the car where Breaux was waiting. Defendant handed Breaux a pager and instructed him to enter the bank in 30 seconds. Defendant then walked back into the bank and aimed a 9mm handgun at Ms. Dupuis.
There were no other eyewitnesses in the bank at the time, but the bank’s surveillance camera captured the initial stages of the robbery as it unfolded. As soon as he re-entered the bank, the defendant pulled out a 9 mm handgun and aimed it at Ms. Dupuis. At the same time, Scott pulled out a large revolver and aimed it at Ms. Blanchard. While Scott forced Ms. Blanchard to stand, defendant vaulted over the customer counter and grabbed Ms. Dupuis from behind. Scott forced Ms. Blanchard to walk to the teller area where Dunn was holding Ms. Dupuis at gunpoint. The two men began removing money from the cash drawers while still pointing their weapons at the women. Scott and the defendant then forced both women into a side office. Although there were no video cameras in the office, the lobby camera captured some of this activity. Breaux then entered the bank carrying a Pres-tone Anti-Freeze container filled with gasoline and began to douse the bank lobby with it. Ms. Blanchard appeared to be praying, while Ms. Dupuis stood behind her. At that point, the video equipment was pulled from the wall, interrupting the recording.
A bank customer, Earline Simoneaux, arrived at the drive-up teller window at the same time and noticed that the blinds were drawn, but the slats were open. She peered through the slats and saw two black males running out of the side office. Ms. Simoneaux testified that just as she started to ring the teller call button and just after the two black males bolted through the front door of *457 the bank, she heard a gunshot, and then moments later, two more gunshots. She then saw a black male wearing a white cap run out of the office. He glanced back at her as he ran. |sMs. Simoneaux then drove to the side of the bank where she saw a green Pontiac Sunfire drive out of the parking lot. She attempted to follow the car, but once the police arrived, she returned to report what she had seen. Ms. Simoneaux was certain that the defendant, who was wearing a white hat, had been the perpetrator. He was the one who had fired the shots after the other two black males had left the bank.
Assumption Parish Sheriffs Deputy Michael Brown responded to the bank alarm. As he drove towards the bank he saw a green Pontiac exit the parking lot. Expecting a false alarm, he approached the front door, opened it, and noticed a strong odor of gasoline. He did not see the tellers so he announced his presence. He got no response, but heard a gurgling sound coming from the side office. As he approached he saw Jacqueline Guillot Blanchard lying face down in a pool of blood gasping for breath. He saw Lisa Dupuis’ legs, and looked behind the teller counter and saw her lying in a pool of blood as well. He ran back outside to call for additional officers and an ambulance. He re-entered the bank and noticed Ms. Blanchard attempting to breathe. He checked Ms. Dupuis for a pulse and determined that she was dead.
Ms. Blanchard was moved to the lobby when the ambulance arrived. She died on the way to the hospital. Further investigation revealed that both women were shot multiple times in the head and upper body. Bullets and empty casings that matched the defendant’s 9 mm weapon were found under and around the victims’ bodies. Police found gasoline on Ms. Blanchard’s desk, the teller counter, and in areas inside the office. The video equipment along with a total of $16,615.00 in cash was missing from the bank.
Ms. Simoneaux returned to the bank and gave police a description of the car and the defendants. At that point police put up roadblocks throughout the parish. Two deputies attempted to stop a vehicle fitting the description at a roadblock in Ascension Parish. The defendants drove through the roadblock at high speed. As they rounded a curve, the vehicle, driven by the defendant, drove directly into a train which was passing on nearby railroad tracks perpendicular to the highway. Uninjured, the defendant and Scott jumped out of the front of the car and fled. A foot chase ensued.
Kendall Breaux exited the back seat of the car and attempted to run away but was captured by police at the |4scene of the crash. Defendant and Scott were captured in a sugar cane field about two miles away. All of the money, the video equipment and both weapons were found. Some items were found in the vehicle while other items were found in the cane field where Scott and defendant were hiding.
Dunn, 01-1635 at 2-4, 831 So.2d at 865-66.
In March, 1999, defendant James Dunn was found guilty of first degree murder for killing Jacqueline Guillot Blanchard and Lisa Ann Dupuis. Following the penalty phase hearing, the jury sentenced the defendant to death on each count after finding two aggravating circumstances: 1) the offender was engaged in the perpetration or attempted perpetration of an armed robbery; and 2) the offender knowingly created a risk of death or great bodily harm to more than one person. Defendant *458 appealed his sentence and conviction to this court. On original appeal to this court, both the state and the defense argued the issue of the defendant’s mental status based on the testimony from the original trial. Subsequent to the submission of briefs on the appeal, but prior to this court’s ruling, the United States Supreme Court held the execution of mentally retarded persons violates the Eighth Amendment’s prohibition against cruel and unusual punishment. Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). This court affirmed defendant’s conviction, but because evidence of possible mental retardation was presented at the penalty hearing for mitigation purposes only, this court could not resolve the issue definitively, although it found “reasonable ground to doubt whether defendant is mentally retarded.” State v. Dunn, 2003-0821 (La.5/9/03), 847 So.2d 1183.[1] While affirming the defendant’s convictions for first degree murder, this court pretermitted Rule 28 review of the penalty phase and remanded the case to the district court for a hearing on defendant’s 15mental status. State v. Dunn, 01-1635, pp. 27-31 (La.11/1/02), 831 So.2d 862, 884-888.
The trial court thereafter appointed an independent panel of experts, consisting of Dr. Alicia Pellegrin, accepted as an expert in clinical psychology, Dr. Charles P. Vos-burg, accepted as an expert in forensic psychology, and Dr. David Hale, accepted as an expert in the field of clinical psychology and clinical neuropsychology, to examine defendant. In addition, defendant also presented his own expert, Dr. Drew Gouvier, who was qualified as an expert in psychology and neuropsychology. A hearing was held on several dates in October and November, 2008, before the Hon. Alvin Turner, and the trial court subsequently found defendant not mentally retarded. Defendant has appealed that determination to this court, and because we find no error in the trial court’s ruling that defendant is not mentally retarded and therefore not exempt from capital punishment, Rule 28 review of defendant’s sentence is also now before the court.
DISCUSSION
The American Association on Mental Retardation (AAMR)[2] defines mental retardation as follows:
Mental Retardation refers to substantial limitations in present functioning. It is characterized by significantly sub-average intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18. Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).[3]
*459 Atkins v. Virginia, 536 U.S. 304, 308, 122 S.Ct. 2242, 2245, n. 3, 153 L.Ed.2d 335 (2002).
The American Psychiatric Association (“APA”) provides a similar definition as follows:
The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system. Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). “Mild” mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. Id., at 42-43.
Atkins, 536 U.S. at 308, 122 S.Ct. 2242 at 2245, n. 3,153 L.Ed.2d 335 (2002).
Similarly, La.C.Cr.P. art. 905.5.1(H)(1) provides a concurrent definition to those provided by the American Association on Intellectual and Developmental Disabilities (“AAIDD”) and the APA:
“Mental retardation” means a disability characterized by significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. The onset must occur before the age of eighteen years.
As previously mentioned, the United States Supreme Court in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), held the execution of mentally retarded individuals is excessive under the Eighth Amendment and does not measurably advance the deterrent or the retributive purpose of the death penalty. Id, 536 U.S at 321, 122 S.Ct. at 2252. Atkins was based on the “evolving standards of decency” that have occurred since the Supreme Court’s decision in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), allowed the execution of a mentally retarded defendant. State v. Williams, 01-1650 (La.11/1/02), 831 So.2d *460 835. In Atkins, the Supreme Court found the deficiencies of the mentally retarded do not exempt them from criminal sanctions, but do diminish their personal culpability, as they are far more likely to act on impulse rather than premeditation, and in a group setting they are more often followers than leaders. Id., 536 U.S. at 318, 122 S.Ct. at 2250. The Atkins court reiterated one of the purposes of capital punishment is to deter offenders who act with premeditation and deliberation. Id., 536 U.S. at 319,122 S.Ct. at 2251. Because a mentally retarded offender acts on impulse and not premeditation, the intended deterrent effect of the punishment fails to serve its purpose. Id. Additionally, the Court stated:
The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the ^punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same cognitive and behavioral impairments that make these defendants less morally culpable-for example, the diminished ability to understand and process information, to learn from that experience, to engage in logical reasoning, or to control impulses-that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information. Nor will exempting the mentally retarded from execution lessen the deterrent effect of the death penalty with respect to offenders who are not mentally retarded. Such individuals are unprotected by the exemption and will continue to face the threat of execution. Thus, executing the mentally retarded will not measurably further the goal of deterrence.
Id., 536 U.S. at 320,122 S.Ct. at 2251.
With respect to retribution, the Court found the severity of the punishment imposed depends on the culpability of the offender. Id. Thus, given the reduced culpability of a mentally retarded offender, the imposition of the death penalty would be inappropriate. Id.
Although the Atkins court rejected the notion of imposing capital punishment on mentally retarded offenders, it reiterated its approach in Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, as leaving “to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.” Atkins, 536 U.S. at 317, 122 S.Ct. at 2250 (quoting Wainwright, 477 U.S. at 405, 416-417, 106 S.Ct. 2595, 91 L.Ed.2d 335). As such, several months after the Supreme Court issued Atkins, this court set forth the procedure to be followed by courts in Louisiana, in State v. Williams, 01-1650 (La.11/1/02), 831 So.2d 835.
In Williams, while affirming the conviction of the defendant for first degree murder, this court remanded the case to the trial court for an evidentiary and contradictory hearing before a judge on the issue of the alleged mental retardation of | f)the defendant, and instructed the trial court to treat the issue procedurally as a pre-trial competency hearing. Williams, 01-1650, p. 29 (La.11/1/02), 831 So.2d 835, 858. Furthermore, Williams instructed that the procedure should be appropriately modified when necessary to address the particulars of assessing mental retardation. Id. This court also noted that instead of physicians, experts with the appropriate expertise to diagnose mental retardation shall be utilized. Id., at 30, 831 So.2d at 859. Additionally, this court stated the State and the defendant maintained the right to an independent medical examination by an expert of their choice. Id. However, the *461 Williams court noted the trial court must not rely so extensively upon this expert testimony as to commit the ultimate decision of mental retardation to the experts. Id.
The defendant has the burden to come forward with some evidence initially to put his or her mental condition at issue. State v. Dunn, 01-1635, p. 26 (La.11/1/02), 831 So.2d 862, 884. Furthermore, this court in Williams adopted the preponderance of the evidence standard, whereby defendant must prove his or her mental retardation by a preponderance of the evidence. Id. at 31, 831 So.2d at 859.
Shortly after the issuance of both Atkins and Williams, the Louisiana Legislature enacted La.C.Cr.P. art. 905.5.1, which codified the procedure for determining whether an offender is mentally retarded. It states in pertinent part:
(C)(1) Any defendant in a capital case making a claim of mental retardation shall prove the allegation by a preponderance of the evidence. The jury shall try the issue of mental retardation of a capital defendant during the capital sentencing hearing unless the state and the defendant agree that the issue is to be tried by the judge. If the state and the defendant agree, the issue of mental retardation of a capital defendant may be tried prior to trial by the judge alone.
La.C.Cr.P. art. 905.5.1(C)(1).
Prior to the scheduled Atkins hearing in the trial court, the defendant filed a |inmotion for a jury trial, arguing he was entitled to a jury determination of his mental retardation, and/or a new sentencing hearing pursuant to La.C.Cr. P. Art. 905.5.1. The trial court granted the defendant’s motion for jury trial, but denied the motion for a new sentencing. However, this court vacated that judgment, finding La.C.Cr.P. art. 905.5.1 inapplicable to the instant case, as the article specifically provides the issue of mental retardation must be raised pretrial by the defendant, and requires that the jury try the issue during the capital sentencing hearing. State v. Dunn, 07-878, p. 6 (La.1/25/08), 974 So.2d 658, 662. Consequently, this court found the statutory requirements in 905.5.1 clearly could not be accomplished in a matter that is remanded post-trial and post-sentencing for an Atkins hearing. Id. This court therefore ordered the procedure in Williams to be used to conduct an Atkins hearing where the question of mental retardation arises post-verdict. Id. at 663.

The Atkins Hearing

As noted above, the generally accepted definition of mental retardation includes significant subaverage intellectual functioning existing concurrently with deficits in adaptive behavior and which must manifest during the developmental stage. Concerning the first prong, the Wechsler scales and the Stanford-Binet are the two most common instruments utilized to assess intelligence, or intellectual quotient (“I.Q.”). Mental Retardation: Definition, Classification, and Systems of Supports 59 (10th Ed.2002). See also, State v. Williams, 01-1650, p. 23 (La.11/1/02), 831 So.2d 835, 854, n. 26. Both maintain a mean IQ score of 100, but the Wechsler scale uses a standard deviation of 15 and the Stanford-Binet a standard deviation of 16 in arriving at scores that indicate less than (or greater than) average intelligence. Mental Retardation, at 61-62. However, the most recent Stanford-Binet 5 test has a standard deviation of 15. Contemporary Intellectual Assessment: Theories, Tests and Issues 11X325 (Dawn P. Flanagan & Patti L. Harrison eds., 2005). In the 2002 AAMR system, the “intellectual functioning” criterion for diagnosis of mental retardation is approximately two standard deviations below the mean. Mental Retar *462 dation, at 58. Consequently, a person scoring two standard deviations below the mean would have an I.Q. of 70 on the Wechsler scale and an I.Q. of 68 using the Stanford-Binet scale.
Dr. Drew Gouvier, defendant’s own expert, was the first to testify concerning the defendant’s I.Q. Dr. Gouvier administered the Stanford-Binet 5 test to the defendant in November, 2006, and reported defendant’s full scale I.Q. as 70,[4] with an adjustment for the “Flynn Effect” to a score of 69. The Flynn Effect, named for James Flynn, a political scientist, is a theory which attributes the general rise of I.Q. scores of a population over time to the use of outdated testing procedures, emphasizing the need for the repeated renormalization of I.Q.-test standard deviations over time. In re: Robert Madrid Salazar, 06-10243 (5th Cir. 3/17/06), 443 F.3d 430, 434.
In an article authored by Flynn, he explains his analysis to determine whether significant gains in I.Q. scores were taking place over time. The scoring data was provided by the publishers of the Wechsler and Stanford-Binet tests, and in each instance, the publishers gave the same test subjects two tests, which had been “normed”[5] several years apart. James Flynn, Tethenng the Elephant: Capital Cases, IQ, and the Flynn Effect, 12 Psych., Pub. Pol, and L. 170, 176 (2006). Flynn then divided the gain in I.Q. scores by the number of years that separated the norm-ing of 112the two tests. Id. This process provided him with twelve estimates of the rate of I.Q. gains over time from 1972 until 2002. Id. Flynn then averaged those twelve estimates to reach a rate of gain of .3 points per year since the test was normed. Id. As noted above, Dr. Gouvier applied the Flynn Effect to defendant’s I.Q. score in this instance one point downward to reach a score of 69, using the Stanford Binet’s publication date of 2003 to reach this corrected score. Defendant’s adjusted score of 69 places it two standard deviations below the norm, which places defendant in the range for mental retardation. However, as Dr. Gouvier noted himself in his testimony, there is no way to determine a true I.Q. score. As such, it is generally accepted that a properly administered test should provide a 95% confidence level that the score obtained is the subject’s I.Q. within a five point range. This means the defendant’s actual score could be anywhere from 64 to 74.[6]
Dr. David Hale, one of the court appointed panel of experts, also administered *463 an I.Q. test to the defendant, in November of 2004. Dr. Hale administered the WAIS-III test, along with several other tests which demonstrated defendant was exhibiting a mild degree of depression and a moderate degree of anxiety.[7] Dr. Hale testified the result of the WAIS-III test was an I.Q. of 78, which he further reduced to 75 after accounting for the Flynn Effect. A score of 75 gives a 95% confidence level the defendant’s I.Q. is between 70 and 80.
| ,3In April, 2007, Dr. Alicia Pellegrin also administered the WAIS-III to the defendant for a second time.[8] Dr. Pellegrin initially reported the defendant’s I.Q. score as 75, but later amended that score to raise it by three points to 78. Dr. Pelleg-rin testified the reason for the amendment was an error in the initial manual scoring that was later corrected by computer scoring. Concerning a reduction for the Flynn Effect, Dr. Pellegrin, while acknowledging the existence of the theory, was reluctant to apply it to the defendant’s score because she felt there was still disagreement as to the exact number the score should be reduced. Without the application of the Flynn Effect, Dr. Pelligrin testified defendant’s I.Q. score ranges from 73-82. However, despite her reluctance to apply the Flynn Effect, Dr. Pelligrin opined the defendant’s score in this instance should be reduced by three points because of the serious consequences involved. Such a reduction would bring the defendant’s score to 75, with a range of 70-80.[9]
As discussed above, the second prong of the definition of mental retardation is that the individual must have substantial deficiencies in adaptive functioning. The American Psychiatric Association states adaptive functioning “refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.” Diagnostic and Statistical Manual of Mental Disorders IV, 42 (4th ed.2000). This court in State v. Williams, 01-1650, pp. 23-24 (La.11/1/02), 831 So.2d 835, 854, noted six major life activities | ^related to adaptive functioning: self-care, understanding and use of language, learning, mobility, self-direction, and capacity for independent living.
In determining defendant’s adaptive functioning, Dr. Gouvier administered the Adaptive Behavior Assessment System (“ABAS”), which is performed by collecting information from individuals who are familiar with the subject’s living skills, such as family members, a supervisor, or care provider. The test evaluates the subject’s adaptive functioning in ten skill areas including communication, community use, functional academics, home living, health and safety, leisure, self-care, self- *464 direction, social, and work. For his evaluation, Dr. Gouvier chose the defendant’s older brother by eleven months, Lester Dunn, Jr., and Michael Mariani, the defendant’s supervisor at New Orleans City Park while the defendant was incarcerated [10] at Jackson Barracks between 1992 and 1994.[11]
Dr. Gouvier administered the ABAS to Lester Dunn, Jr., in March, 2007, over the telephone. Dr. Gouvier focused his interview with Lester on Lester’s experience with his brother prior to the defendant’s 1985 incarceration, as after that time period, Lester was only briefly in Tennessee with the defendant, due to Lester’s transfer to Germany with the military shortly thereafter. Based upon Lester’s answers, Dr. Gouvier testified the defendant received a score of 69, demonstrating that just before the defendant turned eighteen, he was substantially impaired in adaptive skills. Although Dr. Gouvier did not testify concerning the specifics of Lester Dunn’s answers on the ABAS, Lester himself testified at the Atkins hearing regarding his | ^perception of the defendant’s living skills.
Lester testified the defendant earned mostly D’s and F’s in school and that he was put in “special” or “slower” classes, although they were not noted on school records as any type of traditional “special education” classes. Lester further testified he often helped defendant with his homework because it was “always challenging” for him. Although Lester planned on joining the military after high school graduation, he testified defendant never had a plan for his time after high school. On cross examination, the state questioned Lester on the correlation between failing grades in school and mental retardation. Lester testified that he, as well as the defendant, received mostly poor grades in school, and they were both required to repeat a couple of grades. Despite having a similar school record as his brother James, Lester testified he did not believe himself to be retarded.
Lester also testified the defendant did not enjoy reading and recalls defendant mostly reading comic books or pictorial material. Lester testified as well even after defendant was released from his first incarceration, he was not able to use the newspaper to look for jobs in the classified section.
Lester stated at the hearing defendant’s hygiene as a child was poor, testifying defendant did not brush his teeth regularly and infrequently bathed. Further, Lester noted defendant was sent home from school several times for defecating on himself, and was the subject of much teasing at the hands of defendant’s siblings (besides his brother, Lester, defendant has two sisters). On cross-examination, however, the State pointed out the defendant’s school records do not indicate he was ever sent home for any hygiene related issues.
Lester stated on direct examination defendant did not cook for himself, did not clean the house or do laundry, and had no *465 hobbies. According to Lester, defendant | i6never obtained a checking account, preferring to deal with cash. Lester testified as well he recalled defendant being a “follower” and generally associating with individuals younger than he.
On cross-examination, the State challenged Lester’s assertion the defendant did not have hobbies during his childhood. The State noted both the defendant’s mother and sister testified the defendant enjoyed go-karts and would take them apart and put them back together.[12] Lester testified that while he agreed his brother enjoyed go-karts as a child, he did not remember defendant working on them mechanically. When asked about the defendant’s own assertion that he was “a body and fender guy” and that he worked as an auto body mechanic from the age of 16 until he was first incarcerated, Lester stated the defendant often overstated his abilities. Lester acknowledged he and his brother worked at their uncle’s auto shop as teenagers, but they were not allowed to work on the cars. The State also presented records indicating the defendant was assigned to work in the auto body shop during his first incarceration. Lester testified he felt his brother was capable of doing such work, but to his knowledge, he never had. On re-direct examination, the defense introduced Department of Corrections documents which indicated the defendant was moved from the mechanic shop to work in the service station less than one year after beginning work. However, the record is not entirely clear as to the reason for the move.
On direct examination, Lester Dunn testified he did not believe the defendant was capable of living independently. Specifically, he stated he felt the defendant would be incapable of moving out on his own and obtaining employment, paying bills, and generally supporting himself without assistance. On cross examination, 117however, Lester acknowledged that his brother lived independently with Opal Lenox for a year and a half, and at no time during that period did Lester assist his brother with any daily functions such as grocery shopping, reading, writing, dressing, or bathing. Also on cross examination, the State questioned Lester on statements he made during the defendant’s penalty phase hearing where he described the defendant as “normal.” Furthermore, the State noted Lester did not raise any of the issues he previously testified about at the instant hearing, such as defendant’s poor hygiene or his tendency to be a follower. Lester attempted to clarify his previous testimony, indicating he considered his family to be normal growing up, but was not necessarily commenting on his brother’s intellect.
The State also questioned Lester about a car that he now possesses, which the defendant had purchased from Opal Len-nox after he was released from jail. Although Lester had in the past helped defendant purchase a car, Lennox testified defendant purchased the second car without assistance from anyone, completing all necessary paperwork on his own. The defendant was also able to obtain a Tennessee driver’s license following his release from his first incarceration.[13]
*466 In April, 2007, Dr. Gouvier also administered the ABAS to Michael Mariani, who was the defendant’s supervisor at New Orleans City Park from 1992 through 1994. Since acting as his supervisor, Mariani maintained some contact with the defendant as Mariani’s son played basketball with the defendant, and Mariam served as a mentor to the defendant. Through his testing with Mariani, Dr. Gouvier obtained a score of 65, which Dr. Gouvier testified is two and one-third standard deviations 118from the mean and indicates a significant impairment in adaptive functioning. Dr. Gouvier testified Mariani was a supervisor in the maintenance department of the park and the defendant was assigned to do jobs associated with the upkeep of the park. All work was closely supervised with no independent projects involving tools. Mariana told Dr. Gouvier the defendant “had to be led a lot” and he was only left alone if it was “something that could be screwed up.” However, on cross examination Dr. Gouvier admitted the DSM-IV suggests a tester should gather information from one or more reliable independent sources concerning the defendant’s deficits or strengths in adaptive functioning in the developmental stage, yet Dr. Gouvier stated he had no such sources. Dr. Gouvier also testified on cross examination that he saw no indications in his review of the defendant’s life instances in which he had been overcome by an irresistible impulse or had diminished capacity to control impulses, a common characteristic of mentally retarded individuals. Furthermore, on cross examination, Dr. Gouvier testified he was not aware of the details of the crime in this matter, specifically, that defendant acted as the leader in planning and executing the crime. Dr. Gouvier admitted the behavior of the defendant during the commission of this crime “could have added additional information.”[14]
Dr. Charles Vosburg was appointed by the court to the Atkins panel to test the defendant’s adaptive functioning. Dr. Vos-burg chose a similarly accepted adaptive skills instrument called the Vineland Adaptive Behavior Scale, which he administered to defendant’s brother, Lester Dunn, and Mike Arabie, the defendant’s probation officer for approximately three years after release from his first period of incarceration.
| inDr. Vosburg interviewed Mr. Arabie in December of 2004, and based upon this interview, determined the defendant’s daily living skills and socialization coping skills to be adequate. Arabie, however, did not have knowledge of and did not wish to offer comments on defendant’s interpersonal relationships or his play and leisure time. Also based upon his interview with Arabie, Dr. Vosburg determined defendant was deficient in his written communication skills. Similarly, Dr. Vos-burg’s interview with Lester Dunn in April of 2005 demonstrated the defendant’s deficiency in expressive communication. Dr. Vosburg also found through his interview with Lester Dunn that defendant was not deficient in receptive communication skills, nor was he deficient in daily living or socialization skills. Based upon the an *467 swers given by Lester Dunn, Dr. Vosburg obtained an adaptive behavior composite score of 79 for the defendant, or above the range for a mentally retarded person.
In his evaluation of defendant, Dr. Vos-burg also reviewed the I.Q. data collected by Dr. Hale, as well as the examination performed by Dr. Zimmerman before the penalty phase hearing. Dr. Vosburg noted Dr. Zimmerman, who interviewed only the defendant, found similar deficiencies in the defendant’s communication skills as well as in some living skills areas, such as cooking and shopping. Overall, however, there was no significant deficit in defendant’s adaptive behavior. Further, Dr. Vosburg reviewed the defendant’s school records and found nothing to support a diagnosis of mental retardation. The defendant’s work records from his employment as a forklift operator also showed no sign of deficient adaptive functioning or mental retardation, and in fact, during his employment, defendant was graded highly by his supervisor. Dr. Vosburg testified that in order for defendant to operate machinery such as a forklift, it would require him to have adequate adaptive | ^functioning.[15] Based upon all the information reviewed by him, Dr. Vosburg concluded the defendant’s adaptive skills were above the mental retardation range.
On appeal, defendant asserts in brief he is mentally retarded, supported not only by Dr. Gouvier’s testimony, but also due to several alleged problems with Dr. Vos-burg’s test scores. More specifically, defendant argues one of Dr. Vosburg’s informants, Mike Arabie, did not have sufficient knowledge regarding defendant’s adaptive functioning to obtain a valid score. Furthermore, defendant contends Dr. Vosburg incorrectly interpreted an instruction in the Vineland Manual. The |2iinstruction from the manual states: “If five or more [don’t knows] are scored in a domain, do not obtain derived scores for this domain or its subdomains.” The defendant avers *468 the large number of “don’t know” answers provided by Arabie in the daily living and socialization domains, specifically the sub-domains of interpersonal relationships and leisure time, invalidated the scores for those domains and invalidated the composite score for the entire test. Dr. Vosburg discounted the subdomain scores in which Arabie was unable to answer a sufficient number of the questions, but still obtained a score for the domain as a whole, based on the scores from the subdomains with which Arabie was familiar. The defendant asserts the only valid domain score is from communication, where the defendant received a score of 60, more than two standard deviations below the mean. The defendant avers all other reported scores should not be considered because of Ara-bie’s lack of familiarity with the defendant in those areas.
The defendant also argues Dr. Vosburg failed to score the tests administered to Arabie and Dunn properly, making the reported results questionable. Each question in the Vineland test should receive a score of “zero”, “one”, or “two.” A “zero” means the test subject does not have that particular skill; a “one” means the subject may have that skill or is developing it, but the subject does not always demonstrate it; and “two” means the subject has the skill and uses it. Of the 220 questions on the Vineland test, there were no scores of “one” in the test given to Lester Dunn and only three in the test given to Arabie. The defendant also notes one of these scores of “one” was for a question that required an answer of either “zero” or “two.”
The defendant further questions the validity of the scores obtained from the test administered to Lester Dunn based on several notations by Dr. Vosburg. Question |2256 asks whether the subject “reads books of at least fourth grade level.” The defendant received a score of “two,” indicating he does read at a fourth grade level and regularly does so. In his notes, however, Dr. Vosburg noted Lester Dunn told him the defendant did not read anything that required comprehension, and only read comic books or magazines with pictures. The defendant received a score of “two” for the question asking whether he had a hobby, despite a notation from Dr. Vosburg stating Dunn told him he did not think the defendant had any hobbies. Finally, question 58 asked if the test subject “watches television or listens to the radio for practical, day-to-day information.” Again Dr. Vosburg scored the question as a “two” even though Lester stated the defendant did not watch or listen to the news or similar programs. Based upon these irregularities, the defendant asserts the score from Mike Arabie should be completely discounted and the score from Lester Dunn should at least be viewed with suspicion.
In its brief, the State asserts the sole issue before this court is whether the defendant met his burden of proof to establish he is mentally retarded and therefore exempt from capital punishment. The State points to evidence establishing defendant did not meet his burden of proof, most specifically calling into question Dr. Gouvier’s diagnosis. Dr. Gouvier only reviewed school records of the defendant prior to age eighteen, where those records showed no diagnosis of mental retardation, no placement in “special education” classes, and no indications of the defendant’s absence from school due to hygiene problems. Furthermore, testimony was elicited at the hearing that defendant did initiate conversations with others, and was described as a “self starter.” During defendant’s first incarceration, the defendant received discipline for an infraction, and thereafter did not receive further discipline, indicating he learned from his mis *469 takes. The Department of Corrections documents l^also indicated defendant has been evaluated by mental health professionals during his present incarceration, with no complications or issues recorded. More specifically, defendant has been described as having “tight, goal-directed thinking and behavior.”
The State noted Dr. Vosburg’s testimony, where he also emphasized the lack of any mental retardation diagnosis prior to the age of eighteen, as well as defendant’s good work records. Furthermore, concerning the alleged irregularities with Dr. Vosburg’s scoring of the Vineland test administered to Lester Dunn and Mike Ara-bie, Dr. Vosburg testified he ruled out the domestic sub-domain for too many “DK’s,” indicating he scored the test correctly. Dr. Vosburg also testified that while the “Flynn Effect” may be an accepted theory used to adjust I.Q. scores, it is not an absolute in psychology (as also noted by Dr. Pelligrin during her testimony). For these reasons, the State asserts defendant has failed to meet his burden of proof to show he is mentally retarded and not subject to capital punishment.

Analysis

As discussed above, the defendant is required to show by a preponderance of the evidence he is mentally retarded, and therefore, not subject to the death penalty. Allocation of the burden of proof to the defendant on the issue of mental retardation is crucial under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) because the decision exempts all mentally retarded persons from execution and over 80% of mentally retarded persons fall within the classification of mild mental retardation. DSM-IV at 43. Within that large class, Atkins may require a fact finder to make exceedingly fine distinctions between those persons who are exempt from capital punishment and those who are not because mildly mentally retarded persons are capable of working and living on their own just as persons of borderline intelligence. DSM-IV at 43. (“During their adult years, [individuals with mild mental retardation] | ¡^usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.”) In fact, mild mental retardation is not a fixed or static condition, particularly if it is not influenced by an underlying general medical condition (e.g., Down Syndrome). Thus, a person classified as mildly mentally retarded at one point in his or her life may not fall within that classification at a later point in life, a development heavily influenced by environmental factors. DSM-IV at 47. (“Mental Retardation is not necessarily a lifelong disorder. Individuals who had Mild Mental Retardation earlier in their lives manifested by failure in academic learning tasks may, with appropriate training and opportunities, develop good adaptive skills in other domains and may no longer have the level of impairment required for a diagnosis of Mental Retardation.”)
For that reason, “[djifferentiating Mild Mental Retardation from Borderline Intellectual Functioning requires careful consideration of all available information.” DSM-IV at 48. That cautionary note for clinical practitioners and diagnosticians applies far more forcefully in a forensic context for Eighth Amendment purposes of distinguishing those persons who are exempt from capital punishment and those who are not.
In this instance, four experts, along with lay witnesses, testified at the Atkins *470 hearing, and between those four experts, three I.Q. tests and two adaptive functioning tests were administered. While the results were not overwhelmingly conclusive in either direction, the majority of the tests indicate the defendant suffers from low intellectual functioning as opposed to mental retardation.
|25As discussed previously, I.Q. scores are not exact and represent a range, generally considered to be five points in either direction, in which the actual score falls. Even within said range, there is still only a 95% confidence level the subject’s true I.Q. is represented. As part of the representation for the Atkins hearing, the defendant was tested three times, and received I.Q. scores of 69, 75, and 75.[16] The ranges associated with the two scores of 75 brush the threshold score for a mental retardation diagnosis; however, it is possible for someone with an I.Q. score higher than 70 to be considered mentally retarded if his adaptive functioning is substantially impaired. Because of the defendant’s borderline I.Q. scores, his diagnosis is heavily dependent on his adaptive functioning. See DSM-IV at 42 (“Impairments in adaptive functioning, rather than a low I.Q. are usually the presenting symptoms in individuals with Mental Retardation.”)
Both Dr. Gouvier and Dr. Vosburg administered adaptive functioning tests to defendant in preparation for the hearing. Dr. Gouvier, defendant’s expert, reported scores of 69 and 65 on the tests he administered to the defendant’s brother, Lester Dunn, and defendant’s former supervisor, Michael Mariani. Lester Dunn also personally testified at the hearing concerning defendant’s adaptive skills; however, much of what he told the court could either not be confirmed or was contradicted by other evidence. Specifically, while Lester testified the defendant had been sent home from school as a child for defecating on himself, school records contain no indication of this ever occurring, nor do the records reflect any absences from school for lack |afiof personal hygiene. Lester also testified he did not believe the defendant was capable of living independently; however, testimony and other evidence showed defendant lived with a girlfriend for some time and further, was capable of dealing with all necessary paperwork and negotiation to purchase a car on his own. Moreover, employment records indicate the defendant was capable of filling out a job application and obtaining a job, in addition to being a reliable worker who received consistently positive reviews from his employers. He was described as a self-starter who worked well with others and on his own. Defendant’s employment as a fork-lift operator also reflected confidence in his adaptive skills. Additionally, the records introduced into evidence from the Louisiana State Penitentiary demonstrate defendant has been consistently evaluated during his incarceration at a “Level 5,” indicating defendant is in no need of any mental health assistance.[17], [18]
*471 Dr. Vosburg, one of the court appointed experts, also administered an adaptive functioning test to Lester Dunn, obtaining a score of 79, which places defendant above the mentally retarded range. As discussed above, while defendant expresses concern about the scoring of several of the questions, reducing the score by several points to take into account any inconsistencies still results in a score above the mental [ 27retardation range.[19]
It is also important to consider the defendant’s behavior during the planning and commission of the instant crime as it relates to his adaptive skills functioning. This court recognized in the appeal of his co-defendant, Anthony Scott, which also entailed a remand to resolve the question of whether he too is mentally retarded and so exempt from capital punishment, that “the defendant’s behavior during and following the commission of the crime can be relevant to the determination of mental retardation.” State v. Scott, 04-1312, p. 85 (La.1/19/06), 921 So.2d 904, 959 (citing State v. Brown, 03-0897, p. 46 (La.4/12/05), 907 So.2d 1, 32 (“Notwithstanding the fact that the defendant’s experts failed to allege that he suffered from mental retardation, his claim is undermined by his display of an intact survival mentality, which Brown exhibited when he destroyed all trace evidence of his crime by burning his victims in his car. Further, he orchestrated the removal of the furniture and sanitizing of his house [and] successfully eluded police apprehension for 82 days.”)) In the instant matter, the evidence at trial established defendant engaged in the leadership and planning of a major bank robbery, which included discussing the robbery with Kendall Breaux and Anthony Scott in advance, borrowing a rental car from his girlfriend, driving from St. John Parish to Assumption Parish to the bank, and obtaining and filling a gasoline can to bring to the scene of the crime in order to conceal commission of the crimes. Furthermore, defendant instructed his co-defendants during the commission of the crime, including handing Kendall Breaux a beeper while Breaux was sitting in the waiting car, with the specific instruction to enter the bank in thirty seconds with the gas. Upon re-entering the bank, where lasAnthony Scott was filling out a money order, defendant and Mr. Scott brandished their weapons, and defendant jumped over *472 the counter to detain Lisa Dupuis, a bank employee. Defendant also instructed Anthony Scott to remove the security video equipment, and shortly thereafter the two bank employees were murdered by the defendant. The perpetrators then fled the scene, with Dunn driving the borrowed getaway car.
This aforementioned plan, with its pre-meditative aspects, clearly lacks the impulsiveness and non-leadership interactions associated with mentally retarded persons. Merely because defendant’s execution of the plan went awry said less about defendant’s adaptive skills[20] (including his wayward driving skills) than about the stress accompanying commission of first degree murder during a major bank robbery. Based upon the firmly established facts of this case, it has been demonstrated 129defendant is capable of initiating, planning, and leading others in the execution of a pre-meditated plan. Furthermore, Dr. Gouvier, the only expert who found defendant mentally retarded, did not consider the defendant’s actions during the commission of this crime in his diagnosis of defendant.
After examining all available information, including the experts’ conclusions, lay testimony, anecdotal evidence, and school and work records, it is clear defendant has not met his burden to show, by a preponderance of the evidence, that he is mentally retarded. Not only has defendant never had a diagnosis of mental retardation prior to these proceedings, the range of possible I.Q.’s that the more recently reported scores represent fall mostly above 70, indicating the defendant is not mentally retarded. There is a stronger indication of potential mental retardation when examining the adaptive functioning scores reported by Dr. Gouvier, but these scores are contrasted by the scores reported by Dr. Vosburg, the anecdotal evidence presented by the State in the form of school and work records, and consideration of defendant’s actions before and during the commission of the instant crime. As such, although defendant’s I.Q. scores and display of some adaptive skills (e.g., forklift operations) would not necessarily preclude a finding of mild mental retardation, he bears the burden of demonstrating that more probably than not he is mentally *473 retarded and so exempt from capital punishment. In this instance, it is clear defendant suffers from low intellectual functioning, but, based upon all the evidence before us, we do not find defendant has met his burden to establish the trial court erred in finding he is not mentally retarded. The trial court’s ruling is affirmed, and defendant is therefore not exempt from capital punishment.

Capital Sentence Review

Under La.C.Cr.P. art. 905.9 and La. S.Ct. R. 28, this court reviews every Isnsentence of death imposed by the courts of this State to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury’s findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, as part of the original appeal, the trial court submitted a Uniform Capital Sentence Report (“UCSR”), and the Department of Public Safety and Corrections (“DOC”) submitted a Capital Sentence Investigation (“CSI”). The State also submitted a Capital Sentence Review Memorandum.
Defendant, James M. Dunn, an African-American male, was thirty-two (32) years of age at the time of the commission of the murder of Lisa Ann Dupuis, a 22-year-old white female and Jackie Blanchard, a 31 year-old white female. Defendant grew up in a two-parent household on Little Hope Street in Garyville, Louisiana, located in St. John the Baptist Parish, with one brother and two sisters, and is the third child of the family. Defendant completed the tenth grade in school and subsequently attended Vo-Tech at Dequincy Correctional Center in Auto Body and Fender repair. According to the UCSR, the defendant’s I.Q. is in the medium range of 70-100, although the defense, as discussed above, strenuously argues he falls in the bottom of that range. Defendant had one juvenile offense for the crime of Receiving Stolen Things. He worked for Dugean Perrilloux as an auto and body mechanic from the age of sixteen until he was incarcerated in 1985 for manslaughter.[21] The defendant was released on parole on August 2, 1995, and was to complete parole on January 16, 2006. On April 6, 1999, the Louisiana Board of Parole revoked his parole because |31of the present offense. During his release he was employed for a total of 18 months by Elmwood Marine, Con Star, and Southern Beverage. Defendant is not married but he does have one child, a daughter, who is presently approximately eleven years old. Defendant’s mother, Joanne Dunne, is still living, and his father died in 1988.

Passion, Prejudice, and Other Arbitrary Factors

Given that Assumption Parish is a small community, and many members of the ve-nire would have been familiar with the murders, the jury was selected from Cal-casieu Parish. While race may have been a factor in these proceedings as illustrated by the State’s reverse Batson challenge (i.e., a claim that defendant used one of his peremptory challenges for racially motivated purposes) and the trial court’s subsequent ruling on the motion, this issue was thoroughly addressed by this court on original appeal and found to lack merit. See, Dunn, 01-1635 at 7-13, 831 So.2d at *474 869-73. No other arbitrary factor appears to have been interjected in these instances.

Aggravating Circumstances

At trial, the State argued two aggravating circumstances: 1) the offender was engaged in the perpetration or attempted perpetration of an armed robbery; 2) the offender knowingly created a risk of death or great bodily harm to more than one person. The jury found such a circumstance present on each count. The evidence, particularly the eyewitness testimony of Ms. Simoneaux which placed the armed defendant alone in the bank’s side office with the victims when the fatal shots rang out, fully supported the jury’s finding.

Proportionality

Although the federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality preview remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991). This court, however, has vacated only one capital sentence on the ground that it was disproportionate to the offense and the circumstances of the offender, State v. Sonnier, 380 So.2d 1, 7 (La.1979), although this court has effectively de-capitalized another death penalty case by reversing it on other grounds. See State v. Weiland, 505 So.2d 702 (La.1987) (on remand, the State reduced the charge to second degree murder and the jury returned a verdict of manslaughter).
This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury’s recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d at 7.
The State’s Sentence Review Memorandum reveals since 1976, seventeen cases have originated as first degree murder charges in Assumption Parish, including the defendant’s case, and of those, juries have recommended the imposition of the death penalty only twice, in the defendant’s case, and the case of his co-defendant, Anthony D. Scott. Given the scarcity of comparable cases in Assumption Parish, it is appropriate for this court to look beyond the judicial district in which the sentence was imposed and conduct the proportionality review on a statewide basis. State v. Davis, 92-1623, pp. 34-35 (La.5/23/94), 637 So.2d 1012, 1030-1031. A state-wide review reflects this court has affirmed capital sentences in a variety of cases involving multiple deaths or when a defendant creates the risk of death or great harm to more than one person. State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162 (exjemployee33 returns to restaurant, shoots three and kills two); State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8 (mixed-race couple stabbed to death in their home during an aggravated burglary); State v. Baldwin, 96-1660 (La.12/12/97), 705 So.2d 1076 (defendant shot and killed his estranged wife and the three men who were with her at the time); State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116 (defendant murdered his estranged girlfriend and severely wounded her mother); State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364 (ex-employee returns to restaurant, kills one employee and attempts to kill another); State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272 (husband kills estranged wife and new boyfriend); State v. Deboue, 552 So.2d 355 (La.1989) (murder of two children in an apartment defendants intended to burglarize). Because this court *475 has overwhelmingly upheld death sentences in such cases, the death sentence imposed in this case does not appear disproportionate.
DECREE
For the reasons assigned herein, and having already affirmed his conviction, this court finds defendant not mentally retarded and affirms his sentence. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La.C.Cr.P. art. 928 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state post-eon-viction | ^proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
KNOLL, J., additionally concurs with reasons.

 Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.

. This conclusion was based in part on the uncontradicted testimony of Dr. Marc Zimmerman, hired by defendant's trial counsel, that defendant is mildly mentally retarded and suffers from "a pervasive pattern of brain dysfunction.”

. Dr. Gouvier, defendant's expert, testified at the Atkins hearing that the American Association of Mental Retardation has since changed their name to the American Association on Intellectual and Developmental Disabilities ("AAIDD”).

.It should be noted that in 2002, the American Association on Mental Retardation published a tenth edition of Mental Retardation: Definition, Classification, and Systems of Supports (10th ed.2002), which contains a conceptually similar but revised definition of mental retardation. It provides as follows:
Mental retardation is a disability characterized by significant limitations both in intel *459 lectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.
The following five assumptions are essential to the application of this definition:
1. Limitations in present functioning must be considered within the context of community environments typical of the individual’s age peers and culture.
2. Valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor, and behavioral factors.
3. Within an individual, limitations often coexist with strengths.
4. An important purpose of describing limitations is to develop a profile of needed supports.
5.With appropriate personalized supports over a sustained period, die life functioning of the person with mental retardation generally will improve.
Id. at 13.
The American Association on Intellectual and Developmental Disabilities ("AAIDD”), formerly AAMR, recently published an eleventh edition of the aforementioned book, entitled Intellectual Disability: Definition, Classification, and Systems of Support (11th ed.2010), which presents its first official definition of the term "intellectual disability,” formerly mental retardation. AAIDD defines "intellectual disability” using an identical definition as that set forth in the tenth edition above; however, it removes all reference to "mental retardation,” replacing the term with "intellectual disability.”

. Dr. Gouvier testified that in order to determine if defendant was setting forth good effort during the test, he administered the "Test of Memory Malingering.” According to Dr. Gouvier, defendant’s scores on this test were within normal limits.

. Traditional normative standard scores are used to compare the examinee's performance to age-level peers from the nationally representative norm sample. Contemporary Intellectual Assessment: Theories, Tests and Issues 331 (Dawn P. Flanagan & Patti L. Harrison eds., 2005). Furthermore, "[t]he great utility of standardized, norm-referenced tests is the ability to make comparisons of performance that are valid and provide information regarding relative standing among a peer group.” Id. at 552.

.It is important to note before the defendant's penalty phase hearing in 1998, his trial counsel hired Dr. Marc Zimmerman to test his intelligence for possible use as mitigation evidence during the (pre-Atkins) penalty phase at trial. Dr. Zimmerman used the Kaufman I.Q. test. While Dr. Zimmerman did not testify at the Atkins hearing in this matter, Dr. Gouvier reviewed the data from that test and testified it was administered correctly. The defendant scored 71 on that test, which translates to a score of 69.5 when the Flynn Effect is applied. With a range of 64.5 to 74.5, the defendant would be on the borderline of mental retardation and low in-tellcciual functioning.

. Similar to Dr. Gouvier, Dr. Hale administered different tests to the defendant during the I.Q. examination to determine if defendant was providing his full effort. Based upon the results of these tests. Dr. Hale opined similarly that defendant was performing at the highest level during the testing.

. On cross examination, Dr. Pelligrin was questioned about what, if any, "practice effect” the defendant could have had as a result of taking the same I.Q. test within approximately two years of each other. Dr. Pelligrin testified she believed it was appropriate to administer this test to defendant, as it had been almost three years since the last test and there is no data to support that it is not appropriate to give the same I.Q. test, as long as it is not within the first year.

.Dr. Pelligrin also attempted to administer an adaptive functioning test to a shift supervisor at the jail which housed defendant, but because of the officer's specific lack of knowledge concerning the defendant, a valid score could not be obtained.

. In 1984, defendant was charged with the murder of Lt. Sherman Walker, Chief of Detectives, St. John Parish Sheriff’s Department, but later pled guilty to manslaughter. Defendant was sentenced to twenty-one years imprisonment at hard labor, but was released on parole after ten and one-half years. He was to complete parole in 2006.

. Dr. Gouvier testified he also administered the ABAS to the defendant James Dunn in November of 2006 at Angola, reporting a score in the low 80s. However, Dr. Gouvier testified the defendant overestimated his own skill set in reporting on the ABAS, resulting in the higher score. Dr. Gouvier also testified the defendant himself reported he was weak in the areas of social, work, and health and safety.

. Lester did testify that his mother, Joanne Dunn, suffers from increasing dementia in recent years, and consequently, her testimony could be viewed as suspect. Additionally, Dr. Gouvier also administered an adaptive skills to Ms. Dunn. While he was able to obtain a score of 54, he testified this result was not reliable because of her dementia. According to Dr. Gouvier, during the test Ms. Dunn had difficult answering questions and was frequently distracted.

. During his testimony, Dr. Gouvier noted Lester mentioned some of the information contained in Lester’s testimony while he was *466 administering the adaptive skills test. Specifically, Dr. Gouvier stated Lester told him about the defendant's incontinence problems. Lester stated this problem lasted until the sixth grade, but when defendant became interested in girls he began to improve his hygiene. Dr. Gouvier testified that while information such as this is not used to obtain the actual test score, it is used to flesh out the results.

. On cross examination, Dr. Gouvier testified he believed it was possible for defendant to have committed these acts, despite his being mentally retarded, as this could have represented a "peak of function” for him.

. The testimony of Dr. Vosburg represents the most complete information concerning defendant's work history. Although he did not elaborate on the source of his information or about which employee evaluations he reviewed, Dr. Vosburg stated at the hearing:
[T]he work record was connected to when he was released from prison and, again, to work in this local area like I think there was a bottling plant that he worked at, maybe two different bottling plants. If my memory serves me correctly, certainly one of these was in excess of one year's time period that he worked.
And, also, I reviewed some supervisor ratings of his behavior, of his work performance, and like wanting to continue to hire him. I think there was a layoff ultimately. Some of the data that I reviewed also indicated that in addition to working as a laborer and a line worker in a bottling plant, he also operated a forklift.
[[Image here]]
I would think that when you begin to operate machinery such as that, that does take some skill and some ability to address safety standards, some degree of complication is what I’m trying to say, rather than just a line worker or a laborer position. It’s a little bit more sophisticated.
State: And safety and health and things like that are also considerations that you look at in determining levels of adaptive behavior; is that correct?
Dr. Vosburg: Correct.
[[Image here]]
State: There was no indication in those work records from the supervisor who actually wrote notes on his assessment that Mr. Dunn seemed to be impaired in any way is there?
Dr. Vosburg: I saw nothing of that.
Based upon the testimony elicited at the hearing and information contained within defendant’s pre-sentence report, defendant was employed at Elmwood Marine, a ship building and repair company, ConStar, a bottling company, and Southern Beverage, a beverage distributor. As part of his duties, it appears the defendant operated a forklift during at least one of these jobs, although the record is not entirely clear as to where defendant had this responsibility.

. Concerning the application of the Flynn Effect, while it may be a theory utilized by certain practitioners, this court has not specifically accepted the theory as scientifically valid. Even reducing Drs. Hale and Pelligrin's I.Q. scores for defendant, their results still remain in the borderline range. (See In Re: Robert Madrid Salazar, 443 F.3d 430, 433, n. 1 (5th Cir.2006) "Even assuming that the Flynn Effect is a valid scientific theory and is applicable to Salazar's individual I.Q. score— and we express no opinion as to whether this is actually the case — Salazar’s score readjusted to account for score inflation is still above the cutoff for mental retardation.”). It is only when the Flynn Effect is applied to Dr. Gouvier's scores that they are reduced below the range for mental retardation.

. Carroll Gilcrese, Mental Health Director for Louisiana State Penitentiary, testified at the hearing of this matter regarding the classification system of levels of care for inmates. *471 Ms. Gilcrese testified defendant James Dunn has consistently received a Level of Care 5, indicating the defendant has no mental health problems or concerns. If he were identified as having a developmental disability, he would be classified as a Level 4. During his incarceration, defendant has only been classified as Level 5, and has never been classified as a Level 4.

. It is important to note the record does contain evidence that defendant has taken college-level classes during his incarceration through a program provided by Delgado Community College for which he may receive “good time” credits. However, testimony from Ms. Jeralynn Jessica Madere, former Assistant Dean in the Continuing Education at Delgado from 1989 to 1999, indicates the inmates are not required to have a high school degree or obtain a G.E.D. before enrolling in the classes, and she did not recall any inmate failing a course. Specifically, although Ms. Madere did not know defendant personally, she testified the program was designed to provide motivation to the inmates, and not reinforce negative experiences they may have had in the past. Consequently, we do not find defendant's participation in this program determinative as it relates to this court's decision in the instant matter.

. Defendant asserts the test administered to Mike Arabie should be discounted, as it appears Dr. Vosburg did not appropriately adjust his scoring based on the number of "don't know” answers provided by Arabie. Even if this test were not to be considered, the absence of that score does not affect this court’s finding that defendant has not met his burden of proof to establish mental retardation.

. Dr. Pelligrin testified about adaptive functioning in general, in addition to the consideration of defendant’s actions during the commission of this crime, stating the "record speaks for itself”:
Again, we spent a lot of time talking about getting collateral information from sources about his adaptive functioning and we see what the problems there are. I don't know half the time when we're doing this kind of work, am I really testing a person's adaptive functioning or am I testing the person that I'm asking questions, am I testing their memory, you know, if you're asking them to go way back. Or, you know, I think it's several steps removed. I think that the best data in every case but in this case is what the record reflects.
[[Image here]]
The record reflects that he is capable of planning, self-initiating, initiating interactions with others, initiating walking in off the street to fill out a job application, initiating going to — taking his income tax and purchasing a car which was what one of his girlfriends said that I saw in the trial transcript, keeping a job, waking himself up in the morning, getting himself dressed, driving to work, keeping a job, giving his girlfriend whatever she wants financially and then that's not even to get — that’s leaving aside the elements of the crime that are just replete with time after time of his initiating, being a leader, instructing others, carrying out a sequence of events.
Again, I think the record speaks for itself. I think you have to go so far out of the way to ignore that by saying, as we heard yesterday, that that's an example of peak performance. Well, I guess you could explain any behavior away, but when you look at the totality of the record, I think it speaks for itself.

. As previously mentioned, defendant was originally charged with First Degree Murder but pled guilty to Manslaughter. He was sentenced to 21 years imprisonment at hard labor.